

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

APPLERA CORP. and ROCHE MOLECULAR
SYSTEMS, INC.,

        Plaintiffs and Counterclaim Defendants,

        -against-

MJ RESEARCH, INC. and MICHAEL and JOHN
FINNEY,

        Defendants and Counterclaim Plaintiffs.

No. 3:98 CV 1201 (JBA)

January 7, 2004

[FILED UNDER SEAL]

HIGHLY CONFIDENTIAL

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION IN LIMINE OF
MJ RESEARCH INC. AND MICHAEL AND JOHN FINNEY
TO EXCLUDE ANY TESTIMONY REFERRING TO OR RELYING ON THE
EXCLUDED TESTIMONY OF GERALD FORD, PH.D.**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

PROCEDURAL HISTORY ............................................................................................... 2

ARGUMENT ................................................................................................................... 8

A.    Introducing Dr. Ford's Conclusions Would Violate the Law of the Case
       and Would Contaminate the Jury ........................................................................ 8

B.    Under Federal Rule of Evidence 703, Plaintiffs' Experts May Not Disclose
       Dr. Ford's Inadmissible Conclusions to the Jury ................................................. 9

C.    Plaintiffs' Experts May Not Properly Rely on Dr. Ford's Testimony for
       Any Purpose ...................................................................................................... 11

CONCLUSION ............................................................................................................... 15

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

American Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569 (11th Cir. 1985) .......................... 12

Christianson v. Colt Indus. Operating Corp., 486 U.S. 800 (1988)........................................ 8

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) ......................................... 11, 14

Law v. Nat'l Collegiate Athletic Ass'n, 185 F.R.D. 324 (D. Kan. 1999) .............................. 13

Marfia v. T.C. Ziraat Bankasi, 100 F.3d 243 (2d Cir. 1996) .................................................. 8

Oneida Indian Nation of New York v. County of Oneida, 214 F.R.D. 83 (N.D.N.Y. 2003) .. 8

Ortho Diagnostic Sys., Inc. v. Abbott Lab., Inc., 926 F. Supp. 371 (S.D.N.Y. 1996).......... 13

United States v. Dukagjini, 326 F.3d 45 (2d Cir. 2003) ...................................................... 11

**Other Authorities**

29 Charles A. Wright and Arthur R. Miller, Fed. Prac. & Proc. Evid. §§ 6274, 6275 .......... 12

4 Jack B. Weinstein, Weinstein's Federal Evidence § 703.05 ................................................ 9

**Rules**

Fed. R. Evid. 702 ................................................................................................................. 11

Fed. R. Evid. 703 ............................................................................................................. 9, 11

Fed. R. Evid. 802 ................................................................................................................... 9

Fed. R. Evid. 807 ............................................................................................................. 3, 10

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

## PRELIMINARY STATEMENT

Defendants respectfully move seeking an order, <u>in limine</u>, precluding plaintiffs PE/Applera Corporation and Roche Molecular Systems, Inc. (collectively "plaintiffs")[1] from introducing evidence referring to or relying on the expert opinion testimony of Gerald Ford, Ph.D.

The Court (through Judge Squatrito) has already ruled, and confirmed on reconsideration, that Dr. Ford's testimony and survey results are inadmissible hearsay, are unreliable and should be excluded from introduction into evidence. <u>See</u> Exhibit 1, (hereinafter "Ex. ___"), at 7-9.[2] Now, simply ignoring the Court's ruling, plaintiffs have listed Dr. Ford as a trial witness and included his expert reports and survey results as documents to be offered into evidence. (Ex. 2.) MJ has objected to such testimony and documents. (Ex. 3.) Dr. Ford must be precluded as a witness and his reports rejected as inadmissible based upon the extant rulings.

In addition, even if Dr. Ford is not a witness and his reports are not trial exhibits, plaintiffs evidently seek to introduce his conclusions through other means:

- Plaintiffs have recently identified the conclusions of Dr. Ford as "more important[]" evidence supporting their claim of damages and inducement in this action than a list of supposedly infringing customers.[3]

- Dr. Dov Frishberg, plaintiffs' damages expert, relies on Dr. Ford's discredited opinion testimony at length to establish: (i) the necessity for an SAP-like licensing scheme; (ii) the reasonable royalty rate; and (iii) the number of purportedly infringing acts. (<u>See infra</u> at 11-12.)

- Dr. Janusz A. Ordover, plaintiffs' antitrust expert, relies on Dr. Ford's survey to conclude: (i) that MJ's customers did not engage in PCR at

---

[1] MJ Research and Michael and John Finney are collectively referred to as "MJ".

[2] All exhibits referenced are attached to the Affirmation of John E. Beerbower, dated January 6, 2004.

[3] Ex. 4, at 11.

1

lower rates than the customers of other thermal cycler suppliers; (ii) that the SAP was procompetitive and (iii) that PE/Applera's intent in creating the SAP was not anticompetitive. (See infra at 13.)

- Dr. Marcel Margulies, plaintiffs' infringement expert, relies on Dr. Ford's conclusions about thermal cycler use to conclude that "claim 16 of the '493 patent is infringed". (See infra at 14.)

Plaintiffs' effort to introduce supposed expert evidence that is both misleading and unreliable is not only contrary to the Federal Rules of Evidence but violates the Court's prior orders. It should be prevented.

## PROCEDURAL HISTORY

### The Excluded Ford Report(s)

To establish inducement to infringe the PCR Process Patents (and claim 16 of the '493 instrument patent) with resulting damages, plaintiffs must prove direct infringement of the PCR Process Patents by end users of MJ's thermal cyclers. To that end, plaintiffs filed Dr. Ford's Rule 26 Expert Report on August 31, 2000. (Ex. 5.) ("First Ford Survey.")

Dr. Ford is a survey expert. In the First Ford Survey, Dr. Ford described a telephone survey of MJ's customers purportedly designed by him to determine whether customers using MJ's thermal cyclers had ever performed PCR techniques on their thermal cyclers in a specified PE/Applera field. (Ex. 5, at 1.)[4] Falsely identifying themselves as representatives from an "independent marketing survey", Dr. Ford's employees asked to speak to the individuals at MJ's customers' labs that were "most knowledgeable about how the thermal cyclers . . . are used". (Ex. 5, at Tab B.) Upon reaching an individual who agreed that he or she was "most knowledgeable", the interviewer asked: (i) how long that individual had known the most about thermal cycler use at his or her lab, (ii) how many

---

[4] Plaintiffs admitted that Dr. Ford was retained to "confirm" PE/Applera's preexisting belief that upwards of 90% of MJ's customers infringed the PCR Process Patents. (Ex. 6, at 360-61, 680.)

2

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

cyclers were in the lab; (iii) which brands of cyclers were in use; (iv) and what PCR

techniques were used on each brand of cycler. (Id. at 8, 11, Questions 3.1, 5.) Dr. Ford

made no attempt to gauge the use of lab thermal cyclers for cycle sequencing or other

noninfringing uses (Ex. 7, at 87-88), or the relative use of lab thermal cyclers for PCR in

PE/Applera's fields versus other noninfringing uses.

       Dr. Ford concluded that "approximately ninety-six percent . . . of all MJ

Research thermal cyclers in the United States have been used to perform PCR technique(s)

in a specified Perkin-Elmer field during the past six years or less". (Ex. 5, at 15.) Despite

MJ's repeated demands, and contrary to the requirements of Fed. R. Evid. 807, Dr. Ford and

plaintiffs refused to disclose even the identities of MJ's customers sampled or the individuals

so interviewed.[5]

       MJ moved in limine to exclude Dr. Ford's testimony.  Plaintiffs filed 86

pages of briefs in response.  The Court held oral argument (for almost an entire day) on

September 27, 2001.  (Ex. 8.)

       At oral argument, the Court expressed its strong concern that presentation of

Dr. Ford's conclusion that 96% of MJ's users have performed PCR would mislead the jury:

- "This is a jury trial, not a court trial.  If it were a court trial, all of this
  would be very simple.  I would deny all these motions [to exclude] and
  say charge forward.  That's the mistake you made.  With a jury it's a
  totally different kind of presentation of the evidence.  I mean, once they
  hear numbers, in fairness to a jury, **they may be contaminated**,
  especially by some of the artful onslaught of [plaintiffs'] arguments . . . ."
  (Ex. 8, at 74-75.)  (Emphasis added.)

- "I'm not going **waste the jury's time** [by allowing plaintiffs to tell the
  jury that 96% of the machines have been used for PCR]."  (Id. at 108.)
  (Emphasis added.)

---

[5] See MJ's Mem. in Supp. Mot. In Lim. on Ford, at 19-20; Plaintiffs' Opposition, at 39-43; MJ's Reply, at 12-14.

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

- "What we're doing here, it's a **parade of horribles for the jury**, and all you're doing is developing a thing that will be automatically appealable." (Id.) (Emphasis added.)

By Memorandum and Order entered March 28, 2002, Judge Squatrito excluded Dr. Ford's testimony as inadmissible hearsay. Dr. Ford's methodology and proposed testimony presented problems "with respect to trustworthiness" (Ex. 1, at 8) as "no inquiry was made regarding [survey respondents'] expertise, position, responsibilities, or contact with thermal cyclers." (Id. at 9.) "[A]part from the hearsay issue," Judge Squatrito identified "another flaw in the plaintiffs' reliance on the survey . . . [T]he survey results theoretically could reflect that 96% of the thermal cyclers were once used to perform PCR even though 99% of the time they were used for noninfringing purposes." (Id. at 8.) (Emphasis added.)[6]

Plaintiffs sought reconsideration of Judge Squatrito's Ruling, filing an additional brief also exceeding the Local Rule page limits, and attaching a new survey created by Dr. Ford. (the "Supplemental Ford Survey", attached as Ex. 9.) The Supplemental Ford Survey purported to address only one of the several flaws in the Ford survey identified by Judge Squatrito. Dr. Ford returned to some 30% of the original respondents and asked each to explain the basis for answering that they were the most knowledgeable person to answer questions in more detail. According to Dr. Ford, this Supplemental Ford Survey confirmed that the original respondents "had experience, responsibilities, or contact . . . that would be commensurate with them being the most

---

[6] At oral argument, Judge Squatrito had expressed the additional concern that Dr. Ford did not ask respondents whether they themselves were licensed, practiced PCR outside of PE/Applera's fields, or were otherwise immune from patent litigation. Judge Squatrito described what such a (less misleading) survey would look like (Ex. 8, at 33), and stated that the issue of noninfringing activity related to the question of "to what extent is [Dr. Ford's] survey trustworthy". (Id. at 71.) Rather than going to the "weight of the survey", the Court believed that the survey's confusion of infringing and noninfringing circumstances created a possibility that the jury would be "automatically and emotionally misled". (Id. at 74-75.)

4

knowledgeable . . . [and also] makes clear the respondents in the original survey had

personal knowledge of whether or not their MJ Research thermal cyclers were used to

perform PCR". (Id. at 4-5.)

Dr. Ford's complacent expression of confidence in his previous results was

astonishing in light of the actual responses he received. Here is what some respondents said:

- "I'm not sure that I would have answered that way because certainly I'm not the most knowledgeable. Perhaps the answer was incorrectly recorded."

- "I don't think I would have said that I was the most knowledgeable because I was not in charge of them."

- "I don't know. I mean, the people here know the basic knowledge about the thermal cyclers. All of them. I'm not sure why my name is on it."

- "I didn't really have any responsibilities. I was the person who bought the thermal cycler and set them up and that was about it."

- "I wouldn't say I have any real responsibility over the machine."

- "I'm not really the one who works with the machine. There's a tech there who is more responsible."

- "I'm not sure. Pretty much no responsibility."

- "Don't know."

- "They are just there. There is nothing to do about the thermal cycler. They are basically carefree."

- "I'm the professor in them, and if I said I was the most knowledgeable, I now feel that my technicians have a better position on how they were used in 2000 and currently."

(Ex. 9, at Tab 3.)  At least 44 out of the new sample of 130 respondents gave answers that

raise serious questions about the reliability of their responses to the First Ford Survey--

revealing a lack of responsibility for or knowledge of thermal cycler use or actually

disclaiming the prior representation or seeking to revise their earlier answers. See Appendix

5

A to this Memorandum. These results clearly confirmed the validity of MJ's criticism of the survey and vindicated Judge Squatrito's concerns.

The Court denied plaintiffs' motion for reconsideration <u>even before</u> MJ had a chance to reply. (Ex. 10.)

On September 19, 2002, almost two years after discovery had closed and without explanation, motion for leave or any other action, plaintiffs sent MJ a "Second Supplemental Declaration of Dr. Gerald L. Ford." (Ex. 11.) While in his first two reports, Dr. Ford claimed that 96% of thermal cyclers were used to perform PCR, Dr. Ford now claims that "approximately ninety-nine percent . . . of all MJ Research thermal cycler(s), as of July, 2002, have been used to perform PCR techniques(s) in specified Perkin-Elmer fields". (<u>Id.</u> at 9.)[7] This new survey was of a different sample.

According to Dr. Ford, there are only two differences between the conduct of his original survey and this new survey: (1) respondents, instead of being told that the survey was being conducted by an "independent marketing research company", were now told that that the survey was being conducted by an "independent research company"; and (2) respondents were now informed that because this was an "important research study", there was a need for "truthful, thorough, and accurate responses". (Ex. 11, at 4.) "In all other respects, the second follow-up survey and the original survey were the same". (<u>Id.</u>)

### *Plaintiffs' Continued Attempts To Introduce Dr. Ford's Excluded Testimony*

Despite the Court's clear prior rulings, plaintiffs have recently identified Dr. Ford's testimony as the primary source of its evidence of direct infringement and damages in

---

[7] The second survey only inquired of 120 respondents (or exactly 2% of an original universe of over 6,000). (Ex. 11, at 4-5.)

6

supplemental interrogatory responses dated September 29, 2003.[8]  That is, despite the

Court's rulings, plaintiffs will seek to use Dr. Ford to establish the <u>fact of end user direct</u>

<u>infringement</u> of the PCR process patents and the <u>scope of such alleged use of the PCR</u>

<u>process</u>.[9]

        In addition, in a new supplemental expert report disclosed last month,

Marcel Margulies, plaintiffs' infringement expert, relies in part on Dr. Ford's conclusions

about thermal cycler use to conclude that "claim 16 of the '493 patent is infringed".  (Ex.12,

at 10.)[10]

        Finally, although the excluded Ford evidence features heavily in the opinions

and conclusions of plaintiffs' other expert reports, from its damages expert and from its

antitrust economist, plaintiffs have not modified those reports to eliminate their improper

references to this excluded testimony.

---

[8] MJ asked PE/Applera to "identify each person that you assert was actively induced to perform unlicensed PCR . . . and the acts of MJ Research that induced that performance . . . ."  In response, PE/Applera listed customers of MJ that it believed performed PCR on machines that were not "authorized", and then added:

> "In addition, and more importantly, Applera surveyed MJ's customers in May-June 2000 and determined that ninety-six percent (96%) of MJ's thermal cyclers have been used for PCR in Applera's fields . . . .  Applera conducted a follow-up survey of MJ's customers in July, 2002 and determined that ninety-nine percent (99%) of all of MJ's thermal cyclers have been used to perform PCR in Applera's fields.  (Ex. 4, at 11.)

[9] The Court has previously concluded that Dr. Ford's testimony with respect to inducement is "unnecessary" (as well as misleading hearsay) because the plaintiffs may prevail using direct evidence.  (Ex. 1, at 9, n.2.)  Additionally, plaintiffs have previously explicitly disclaimed use of Dr. Ford's survey to meet their burden of proving inducement.  (Ex. 8, at 10: "We're not going to use the survey to prove inducement or contributory infringement.")  In light of their recent submissions, it is at best unclear whether plaintiffs would stand by this commitment, should Dr. Ford's survey be readmitted into evidence despite the Court's previous rulings.

[10] Plaintiffs' plan to supplement Dr. Frishberg's opinions on January 8, 2004, after the date provided for motions <u>in limine</u>.  In these circumstances, MJ reserves the right to move to exclude Dr. Frishberg's testimony in total after it has reviewed his second supplemental report.

# ARGUMENT

Plaintiffs should be prohibited from referring to or relying on Dr. Ford's testimony, opinions and conclusions.

First, Judge Squatrito's ruling establishes a law of the case that the Dr. Ford's survey work is marred by deep methodological problems and is inadmissible hearsay. MJ has relied on that ruling.

Second, were plaintiffs allowed to introduce Dr. Ford's report indirectly, in Judge Squatrito's words, "it's a parade of horribles for the jury, and all you're doing is developing a thing that will be automatically appealable". (Ex. 8, at 108.)

Third, plaintiffs' experts and fact witnesses should be precluded from testifying to the extent that they rely on Dr. Ford's conclusions, because such evidence has been determined to be unreliable and misleading as well as inadmissible hearsay.

## A.   Introducing Dr. Ford's Conclusions Would Violate the Law of the Case and Would Contaminate the Jury

The law of the case here is clear.[11]  Judge Squatrito concluded that Dr. Ford's survey lacked probative value and was irremediable hearsay.  Allowing Dr. Ford himself to testify, or allowing other witnesses to testify to his conclusions, would reverse Judge Squatrito's rulings.  It would severely prejudice MJ, and it would confuse the jury.[12]

---

[11] When a case is reassigned, the transferee judge is bound by previous rulings to at least the same extent as was the transferor judge. See, e.g., Marfia v. T.C. Ziraat Bankasi, 100 F.3d 243, 251 (2d Cir. 1996).  Courts should be "loathe" to reconsider already decided issues "in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice".  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988) (internal quotations and citations omitted); Oneida Indian Nation of New York v. County of Oneida, 214 F.R.D. 83, 95-101 (N.D.N.Y. 2003) (under law of the case doctrine, that absent intervening change of law, new evidence, clear error, or the need to correct manifest injustice, it was inappropriate to disregard the decision of a coordinate court).  Plaintiffs bear the heavy burden of establishing that Judge Squatrito's decisions should be reversed.  Oneida Indian Nation, 214 F.R.D. at 86.

[12] MJ will not reargue its previously briefed motion here.  Of course, MJ does not intend to waive any of the arguments it made in support of its earlier motion to exclude Dr. Ford's testimony.

8

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

MJ has relied, and will continue to rely, on the Court's previous findings about Dr. Ford. It has prepared and will continue to prepare for trial on the understanding that Dr. Ford will not be permitted to testify and his flawed results will not be presented to the jury.[13]

## B.   Under Federal Rule of Evidence 703, Plaintiffs' Experts May Not Disclose Dr. Ford's Inadmissible Conclusions to the Jury

Fed. R. of Evid. 703 provides that:

> "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."

This Rule "provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose, when that information is offered by the proponent of the expert." 4 Jack B. Weinstein, Weinstein's Federal Evidence § 703.05 [2] (quotation omitted). MJ respectfully asks that the Court apply this presumption and preclude plaintiffs' experts from referring to Dr. Ford's conclusions when presenting their own testimony. As Judge Squatrito has already concluded, Dr. Ford's conclusions simply lack probative value. See supra, p. 4.

Through its experts, plaintiffs may wish to tell the jury that "96 percent of the machines have been used for PCR". (Ex. 8, at 108.) Even if the jury were instructed that this percentage is highly misleading, the Court has concluded: "once they hear numbers, in fairness to a jury, they may be contaminated, especially by some of the artful onslaught of [plaintiffs'] arguments." (Ex. 8, at 74-75.)

---

[13] Obviously, if Dr. Ford's report is hearsay, it logically follows that no fact witnesses can testify to his conclusions under Fed. R. Evid. 802.

9

Notably, <u>nothing</u> in Dr. Ford's Supplemental or Second Supplemental Survey purports to address this concern.  None of the (minor) changes in survey format in the Second Supplemental Survey is designed to test how <u>often</u> users perform PCR or how the percentages have changed over time.  Further, MJ has no way to cross-examine Dr. Ford's conclusions on this issue, as plaintiffs have refused to give MJ the information necessary to identify the actual respondents to any of the surveys.

Previously, plaintiffs relied on the "catch-all" hearsay exception of <u>Fed. R. of Evid.</u> 807 to support the admissibility of Dr. Ford's survey, but the Court concluded that the First Ford Survey presented "problems with respect to trustworthiness".  (Ex. 1, at 8.) Respondents were not asked about the source of their expertise or contacts with thermal cyclers.  This failure made it impossible for their answers (about the kind of PCR reactions performed) to be evaluated.  Cross-examination is not available to assess the foundation for the respondents' answers, the respondents' actual knowledge of the facts or understanding of the questions.[14]  Discovery cannot determine whether more competent or more complete information is available.

Dr. Ford's Supplemental Surveys do not abate his basic methodological failing:  he failed to investigate the source of the respondents' knowledge about thermal cyclers.  He refused to provide MJ with respondents' names, so that MJ might inquire of the

---

[14] Dr. Ford has attempted to correct this hearsay issue by two superficial mechanisms.  First, he changed the misrepresentation by which he introduced the Second Supplemental Survey.  But this change does not address the Court's concern that there was "no indication of the interviewer's need for truthful, thorough, and accurate responses to question that potentially could be used to establish a patent infringement claim in so important a case".  (Ex. 1, at 9.)  Second, Dr. Ford tracked the language of the Court's opinion by telling respondents that this was "an important research study we need you to provide truthful, thorough, and accurate answers".  This change does nothing to correct the problem that respondents were <u>not</u> told that their responses would be used to establish that they had infringed plaintiff's patent rights, nor does it identify the source of the respondents' knowledge.

10

respondents independently. Indeed, the Second Survey established that the Court's and MJ's

concerns respecting respondents' basis for their statements were well-founded.[15]

These failings confirm Judge Squatrito's decision and provide an independent

reason to conclude that plaintiffs' experts and fact witnesses should not be permitted to refer

to Dr. Ford's excluded survey under Fed. R. of Evid. 703.

## C.    Plaintiffs' Experts May Not Properly Rely on Dr. Ford's Testimony for Any Purpose

Experts may rely on otherwise inadmissible testimony (without disclosing

such reliance to the jury). Fed. R. of Evid. 702, 703. However, that evidence must be "of a

type reasonably relied upon by experts in the particular field in forming opinions or

inferences upon the subject". Fed. R. Evid. 703. This rule has been interpreted to mean that

an expert is permitted to rely on hearsay evidence only "while reliably applying [his or her]

expertise to that hearsay evidence", United States v. Dukagjini, 326 F.3d 45, 59 (2d Cir.

2003), but an expert may not "repeat[] hearsay evidence without applying any expertise

whatsoever". Id. at 59.

Where experts propose to rely on hearsay evidence outside of their fields of

expertise, the district court should "ensur[e] that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand". Daubert v. Merrell Dow Pharms.,

Inc., 509 U.S. 579, 580 (1993). If it is not, the testimony should be excluded. Dukagjini,

326 F.3d at 54.

---

[15] In a "randomly selected" cross-section of the individual respondents, 44 of the 130 respondents who supposedly possessed the most knowledge of thermal cycler use expressed doubts that make it impossible to conclude that the First Ford Report is trustworthy. Declarants wondered if their responses had been "incorrectly recorded", questioned "why my name is on it" and suggested that "[t]here's a tech there who is more responsible." See Appendix A to this Memorandum. These results only confirm what MJ has previously argued: Dr. Ford's "quick and dirty" evidence of infringement is based on survey responses that are simply untrustworthy.

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

The burden of establishing reasonable reliance is on plaintiffs.  29 Charles A. Wright and Arthur R. Miller, <u>Fed. Prac. & Proc. Evid.</u> § 6275.

1.   <u>Dr. Dov Frishberg</u>

Dr. Dov Frishberg, who relies on Dr. Ford's conclusions, is a former accountant. (Ex. 6, at 64.)  He was intimately involved in the planning of Dr. Ford's flawed First Survey (<u>id.</u> at 234), helped draft questions for the survey (<u>id.</u> at 236), and even edited a draft of the First Ford Survey before its submission (<u>id.</u> at 240).  Not surprisingly, Dr. Frishberg's conclusions are intimately tied to Dr. Ford's.

<u>First</u>, Dr. Frishberg apparently expects to testify that the SAP royalty "in effect is only being paid on those T[hermal] C[yclers] that will be used for PCR in P-E's fields".  (Ex. 13, at 19.)  The basis for this testimony is that the royalty is "discounted" to 93% of what it would be in a world where all thermal cyclers are used to perform PCR in PE/Applera's fields, and that, crucially, this discount is <u>accurate</u> according to Dr. Ford.  (<u>Id.</u> at 18-19.)  Any testimony as to the accuracy of PE/Applera's 93% discount should be excluded.  There is no evidence that Dr. Frishberg has used any relevant expertise, or, if he did, used it to evaluate the potential weaknesses in Dr. Ford's report.  Rather, Dr. Frishberg's conclusions are merely a "summary of another expert's opinion".  29 Wright and Miller, <u>Fed. Prac. & Proc. Evid.</u> § 6274; <u>American Key Corp. v. Cole Nat'l Corp.</u>, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not.") (citations omitted).  Moreover, Dr. Ford's survey completely failed to consider whether the surveyed users were licensed or were otherwise immunized from infringing activity--something highly relevant to Dr. Frishberg's damages calculation.  <u>See also</u> <u>supra</u> p. 4, n.6.

12

<u>Second</u>, Dr. Frishberg expects to conclude that all of MJ's thermal cycler sales should be subject to the reasonable royalty rate he has calculated.  (Ex. 13, at 20-21.) This conclusion is also based on his belief that Dr. Ford's numbers were "true"--that is, that the SAP's royalty rate is effectively discounted to account for non-PCR use on MJ's thermal cyclers.  There is no evidence that Dr. Frishberg independently evaluated Dr. Ford's testimony in this respect, and therefore Dr. Frishberg should be precluded from testifying that any reasonable royalty rate should be multiplied by the number of units sold by MJ.

    2.    <u>Dr. Janusz Ordover</u>

Dr. Janusz Ordover relied on Dr. Ford's "number" (as he calls it, <u>see</u> Ex. 14, March 8, 2001, at 37) in determining: (i) that MJ's customers did not engage in PCR at lower rates than other thermal cycler competitors (<u>id.</u>, March 8, 2001, at 39-40); (ii) that the SAP was pro-competitive (Ex. 15, at 19, n.14) and (iii) that PE/Applera's intent in creating the SAP was not anticompetitive (Ex. 14, March 9, 2001, at 20-21).

Dr. Ordover should be precluded from testifying on any of these subjects because, as he testified, "I did not perform independent analysis" of Dr. Ford's conclusions. (Ex. 14, March 8, 2001, at 35);  <u>cf.</u> <u>Ortho Diagnostic Sys., Inc. v. Abbott Lab., Inc.</u>, 926 F. Supp. 371 (S.D.N.Y. 1996) (excluding Dr. Ordover's testimony as antitrust expert where he assumed pricing figures to be true and did not analyze them).  Clearly, Dr. Ordover seeks to be a "channeler" of otherwise inadmissible testimony, where "the record contains no evidence that expert economists do the job that Dr. [Ford] purported to do in his" analysis. <u>Law v. Nat'l Collegiate Athletic Ass'n</u>, 185 F.R.D. 324, 341 (D. Kan. 1999) (analyzing economics expert who placed random calls to employees in order to determine market rates).

13

3.     Marcel Margulies

In Dr. Margulies' most recent supplemental expert report, filed on December 15, 2003, he offers new opinions about MJ's alleged infringement of claim 16 of the '493 instrument patent. He states that after January 2001, infringement of claim 16 of that patent requires a customer: (1) to pre-program an "unauthorized" thermal cycler for PCR; and (2) to actually perform PCR. Dr. Margulies then writes that "survey data shows that 99% of MJ customers use the instruments to perform PCR", and that "[a]ccordingly, claim 16 of the '493 patent is infringed." (Ex. 12, at 10.)

Dr. Margulies has not even identified Dr. Ford's report as one of the sources for his conclusions. (Id. at 2-3; Ex. 16, at 2-3.) However, there can be no other basis for these conclusions, and Dr. Margulies' reference to Dr. Ford's second survey is unmistakable.[16] Dr. Margulies has never explained how he used his expertise as an engineer and co-inventor of an instrument patent in this litigation to discern the reliability of a marketing survey which the Court itself has determined to be unreliable.

Under these circumstances, Dr. Margulies' testimony regarding direct infringement of claim 16 of the '493 patent should be excluded under applicable rules of evidence and Daubert.

---

[16] It is fair to assume that Dr. Margulies was told by counsel that 99% of MJ's customers use their instruments to perform PCR, and assumed this "fact" in concluding the existence of direct infringement.

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

## CONCLUSION

MJ respectfully requests the Court enter an order precluding plaintiffs from

referring to or relying on the excluded testimony of Gerald Ford, Ph.D.

Dated:  January 7, 2003

Respectfully submitted,

by _____

Patrick J. McHugh (ct14072)
FINN DIXON & HERLING LLP
One Landmark Square
Stamford, CT 06901
pmchugh@fdh.com
(203) 325-5000

John E. Beerbower (ct19381)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7415
(212) 474-1000

Gerard F. Diebner (ct24796)
Joseph Manak (ct23153)
GREENBERG TRAURIG, LLP
885 Third Avenue, 21st Floor
New York, NY 10022
(212) 848-1000

C. Allen Foster (ct23115)
Kevin E. Stern (ct23524)
GREENBERG TRAURIG, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3100

Joseph B. Darby (ct21450)
GREENBERG TRAURIG, LLP
One International Place, 3rd Floor
Boston, MA 02110
(617) 310-6000
*Attorneys for Defendants and Counterclaim
Plaintiffs*

15

[[NYLIT:2252554v7:4026W:01/07/04--11:14 a]]

## APPENDIX A:  Survey Respondents

Dr. Ford attempts to establish the trustworthiness of the respondents by a series of Questions: 2.0, 2.1, 2.2 and 2.3.  <u>See</u> Supplemental Ford Survey, Tab 3.

> Q 2.0:  When you were interviewed in 2000, you indicated that you were the person in your lab who was most knowledgeable about how the thermal cyclers in your lab were used.  At the time of your interview in 2000, what were your responsibilities with respect to how the thermal cyclers in your lab were used?  Please be as specific as possible.

> Q 2.1:  Again, at the times of your interview in 2000, what other responsibilities, if any, did you have with respect to how the thermal cyclers in your lab were used?  Again, please be as specific as possible.

> Q 2.2:  Again, at the time of your interview in 2000, was there anything else that made you the person in your lab who was most knowledgeable about how the thermal cyclers in your lab were used?

> Q. 2.3:  What else was there that made you the person in your lab who was most knowledgeable about how the thermal cyclers in your lab were used?

To ensure that the respondent's answers were complete, Questions 2.1, 2.2 and 2.3 were used essentially as repetitive follow-up.  For the sake of simplicity, this Appendix treats the answers to Questions 2.0, 2.1, 2.2 and 2.3 as one integrated answer from each respondent concerning their thermal cycler responsibilities that qualified the respondent as "most knowledgeable" to answer Dr. Ford's original survey in 2000.

The relevant excerpts of responses from 44 of the 130 respondents are set out below, presented in numeric order with the Respondent ID number in parentheses:

- "That's not a question that I could really answer." (45)
- "That they were used.  Everybody was pretty much independent, yes.  Again, I didn't have any [other responsibilities]." (76)
- "I don't think I would have said that I was the most knowledgeable because I was not in charge of them." (87)
- "I was just the one that used it the most.  No other [responsibilities]." (93)

1

- "We also used them for incubation.  We used it for PCR amplification and thermal frequencing and incubation.  Yes.  No."  (124)  [Nonresponsive.]

- "It was to figure out if the cycler that we were thinking about purchasing would do for our company.  The cost comparison between the cyclers on the market at that time."  (126)

- "My responsibilities were to make sure they worked at that time, to make sure everything worked, and I ordered all of the supplies."  (151)

- "I bought supplies for them.  So I was acting as lab supervisor at that time.  It was mainly providing supplies to be sure the cyclers were maintained in operational condition."  (167)

- "I'm not sure what responsibilities I oversaw.  If there was a problem, I took care of them . . . Besides the ones I listed, not much responsibilities for thermal cycler."  (168)

- "I am usually involved in ordering.  I tested out a couple.  I really can't think of anything beyond that."  (173)

- "I set up experiments with them.  I was the person responsible for maintaining them."  (197)

- "My responsibilities were general maintenance, to make sure they were running okay, and perform required maintenance."  (206)

- "I guess I ran the machine, ordered the machine, and worked on the machine.  I guess that was it, those three things. ... Just experience."  (221)

- "I'm not sure.  Pretty much no responsibility.  ... It sounds if I have any say if they can use it or not.  People can use it whenever."  (231)

- "I don't know what you mean responsibilities.  Everyone in the lab used the thermal cyclers."  (232)

- "I don't know.  I was just the person using the thermal cyclers."  (236)

- "What are you talking about?  What do you need?  We use the thermal cycler for six different PCR products.  Nothing generated nothing.  We agree to that mutagenesis.  That is what we want."  (238)  [Nonresponsive.]

- "I don't know.  That was a while ago.  I don't really remember.  Basically, nothing in the lab for service.  They needed to be serviced."  (247)

- "Mainly as an administrator, an equipment coordinator, M11. . . . None, really."  (250)

- "My responsibilities?  I'm in charge of the lab, the equipment running and supplies stocked, and make sure we have a sign-up sheet.  I'm sorry.  I don't understand the question."  (252)

- "Don't know."  (259)

- "I'm the professor in them, and if I said I was the most knowledgeable, I now feel that my technicians have a better position on how they were used in 2000 and currently."  (315)

2

- "I'm sorry. I not getting that question clearly. We have a bunch of thermal cyclers and a lot of people use them, okay? There, were used for sequencing for amplifying fragments of potential cancer genes. ... I find it a hard question to answer. A lot of people used them. My responsibilities end at the projects I work on." (321)

- "I didn't really have any responsibilities. I was the person who bought the thermal cycler and set them up and that was about it." (351)

- "Whenever there was a repair that needed to be done, I just called the company. ... That's it." (367)

- "I don't remember how the thermal cyclers were used. They were used by many people here, like 3 or 4 people." (394)

- "Just, basically, using them for PCR. We didn't have any special issues. I don't have any special, just using them. I don't understand what you're asking." (406)

- "I was just a user. That was about it." (428)

- "I think I was one of them, actually. I really didn't have any responsibilities at all." (503)

- "I'm not really the one who works with the machine. There's a tech there who is more responsible." (514)

- "They are available for all persons to use for PCR. I just have to keep them maintained." (519)

- "They are used mostly for doing PCR. We were genotyping and using them for sequencing. That's about it. And some restriction digestive enzymes and some incubation." (549) [Nonresponsive.]

- "I don't know. I mean, the people here know the basic knowledge about the thermal cyclers. All of them. I'm not sure why my name is on it." (583)

- "I used them. How much more specific? I bought them and I used them." (623)

- "Mostly just for PCR. None. No." (635) [Nonresponsive.]

- "Just making sure that they were running properly is mainly what I do. Oh, that's about it. I don't use them much anymore. We have other people that use them." (644)

- "I bought the thermal cycler and that's about it. It sits on a bench and about 20 or 25 people use it on a daily basis. If it's broke, I would be the one to call to get it fixed." (677)

- "In 2000, I don't remember. I don't think I can do this survey. [I] don't know." (680)

- "Actually, people in the lab just set up their own machines. The answer is none [other responsibilities]. Yes. Kind of because I use it most of the time." (682)

- "I'm not sure that I would have answered that way because certainly I'm not the most knowledgeable. Perhaps the answer was incorrectly recorded." (697)

- "They are just there. There is nothing to do about the thermal cycler. They are basically carefree." (724)

- "I'm the principal investigator so I buy the thermal cyclers. None, really. No." (798)

3

- "I was merely an operator of them."  (820)
- "I wouldn't say I have any real responsibility over the machine."  (854)

4

[[NYLIT:2087664v1:4026W:01/06/04--08:53 p]]

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing was sent via overnight delivery on January 7, 2004, to the following:

James T. Shearin, Esq.
PULLMAN & COMLEY, L.L.C.
850 Main Street
P.O. Box 7006
Bridgeport, CT  06601-7006

Robert A. Cote, Esq.
Victor G. Hardy, Esq.
Jennifer Gordon, Esq.
ORRICK, HERRINGTON & SUTCLIFFE, LLP
666 Fifth Avenue
New York, NY  10103-0001

James Sicilian, Esq.
Mario R. Borelli, Esq.
DAY, BERRY & HOWARD
CityPlace I
185 Asylum Street
Hartford, CT  06103-3499

David Gersch, Esq.
Asim Varma, Esq.
Michael J. Kylce, Jr., Esq.
Bertrand R. Lanciault III, Esq.
ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202

Matthew D. Powers, Esq.
Edward R. Reines, Esq.
WEIL, GOTSHAL & MANGES
201 Redwood Shores Parkway
Redwood Shores, CA  94065

Patrick J. McHugh

{00054976; 1; 4653-2}