**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
Applera Corporation and       :
Roche Molecular Systems, Inc.,:
     plaintiffs,              :
                              :
v.                            :    3:98cv1201 (JBA)
                              :
MJ Research Inc. and Michael  :
and John Finney, defendants.  :
```

**Ruling on Defendants' Motion for New Trial [Doc. # 1314]**

Defendants MJ Research, Inc., Michael Finney and John Finney (collectively, "MJ") have moved for a new trial under Fed. R. Civ. P. 59(a), on grounds that they were denied a fair trial.  In particular, MJ challenges (1) the Court's phasing decision; (2) the Court's refusal to grant MJ additional time to present its case; (3) the Court's failure to preclude or strike Dr. Frishberg's damages testimony; (4) the Court's failure to preclude Dr. Ford's Testimony; (5) the Court's failure to enforce the stipulation that "the claims in which Dr. Mullis is inventor have PCR in them;" (6) the Court's refusal to allow MJ to present the HP-50 Spectrophotometer as prior art; (7) the Court's refusal to instruct the jury on the construction of the term "metal block;" (8) the Court's claim construction; (9) the Court's refusal to preclude parts of Dr. Margulies' testimony; (10) the Court's permission for the jury to handle Dr. Mullis' Nobel Prize; (11) the Court's preclusion of testimony by Michael Finney; (12) the Court's jury instructions; and (13) the Court's

1

interpretation of the jury's verdict.

## I.  Discussion

     Fed. R. Civ. P. 59 provides that a new trial may be granted
"in an action in which there has been a trial by jury, for any of
the reasons for which new trials have heretofore been granted in
actions at law in the courts of the United States."  As a general
matter, "a motion for a new trial should be granted when, in the
opinion of the district court, the jury has reached a seriously
erroneous result or ... the verdict is a miscarriage of justice."
DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d
Cir. 1998)(citations and internal quotation marks omitted).  A
"motion for a new trial must be granted if the trial was not fair
to the moving party." Rivas v. Brattesani, 94 F.3d 802, 807 (2d
Cir. 1996) (citing Montgomery Ward & Co. v. Duncan, 311 U.S. 243,
251 (1940)).  Nonetheless, "[i]t is well-settled that Rule 59 is
not a vehicle for relitigating old issues, presenting the case
under new theories, securing a rehearing on the merits, or
otherwise taking a 'second bite at the apple' ..." Sequa Corp. v.
GBJ Corp., 156 F.3d 136, 144 (2d Cir.1998).

     **(1) Phasing Decision**

     MJ argues that the Court's decision to bifurcate the trial
into patent infringement and antitrust phases unduly prejudiced
it, because it "denied MJ the ability to present either the
existence of or the facts supporting its main defenses to

2

Applera's allegations of willfulness: that MJ believed Applera's
licensing scheme to be illegal . . . ."  Memorandum of Law in
Support of Motion for New Trial [Doc. # 1315] at 2.  The
separation of a trial into patent and antitrust phases is
permitted by Fed. R. Civ. P. 42(a), and is a well-accepted
procedural mechanism in cases of this kind.  See In re Innotron
Diagnostics, 800 F.2d 1077 (Fed. Cir. 1986) (characterizing
separation for trial of patent issues and those raised in an
antitrust counterclaim as a "now-standard practice" and noting
that such bifurcation may serve judicial economy, convenience,
and avoidance of prejudice and confusion).  As the issue of
infringement is analytically distinct from the issues regarding
the validity of plaintiffs' licensing scheme, and trying both the
antitrust and the patent cases together would have created
unnecessary confusion in an already complex case, this Court
believes that its phasing decision was appropriate.  It was not
an evidentiary ruling, and did not preclude the introduction of
evidence relevant to MJ's intent to induce infringement.  See,
e.g., Transcript of Proceedings held on 2/27/04 [Doc. # 1096] at
32-33.

   **(2) Clock Trial**

   MJ argues that the Court's "rigid enforcement" of its clock
trial requirements was prejudicial.  At the February 27, 2004
pre-trial conference, the Court permitted each side 40 trial

hours, and did not allocate the time between Phases I and II.
After defense counsel became ill and a one-week continuance was
granted, precluding the trial of both phases in the time
allotted, the Court limited the time for Phase I to 20 hours per
side.  Both sides were responsible for managing their time,
periodic accounting was given to the Court as trial progressed,
and both sides were aware of and agreed in advance to the ground
rules, including that any time spent questioning witnesses
(either direct or cross-examination) would be counted against the
questioning party, as would time spent reading that party's
designated deposition transcripts into the record, and that the
party losing an objection to evidence would be responsible for
the time spent arguing and resolving the objection.  See February
27, 2004 Transcript [Doc. # 1096] at 43-45.

The fact that the time allowance for the patent phase was
limited to 20 hours after trial had begun cannot be deemed unduly
prejudicial, as defendants could not reasonably have expected to
spent a significantly greater percentage of their earlier-
allotted 40 hours on the patent phase of the case, given the high
degree of importance defendants placed on their antitrust case
throughout this litigation.  The antitrust issues were numerous
and no less complex than the infringement case.  The Court,
moreover, granted in part MJ's March 23, 2004 motion for
additional trial time "in that defendants were permitted to use

4

greater than their allotted twenty hours of trial time but not [the requested] twenty three hours." See April 20, 2004 Order [Doc. # 1085].  Defendants were provided with approximately one additional hour in which to present their case.  Finally, while MJ states that given more time it would have called end user witnesses, offered deposition testimony from party witnesses, and re-called John Finney to testify in his own defense, it has not demonstrated how such evidence would have impacted the jury's verdict.  As this Court previously noted, the evidence MJ presented after Applera rested its case was really a continuation of its evidence, which had already begun during Applera's case presentation, because "through the reordering of witnesses earlier in the case some of the evidence of MJ already [was] produced in the form of cross-examination of some of the witnesses."  Trial Tr. at 2275.

A timed trial is an appropriate tool to focus both parties' presentation of evidence, and is particularly helpful in cases of this kind, where the issues are complex and an unduly long trial would unnecessarily burden jurors.  Where, as here, both sides were represented by sophisticated, experienced litigators, the rules of the clock trial were established and agreed to in advance, and defendants were granted some additional time exceeding the 20 hour limit, the Court cannot conclude that the clock trial was unfair.  Cf. General Signal Corp. v. MCI

Telecommunications Corp., 66 F.3d 1500, 1508-09 (9ᵗʰ Cir. 1995)
(finding district court's enforcement of time limits to be
reasonable where the "court's method of charging time did not
unfairly surprise either party," where "the lack of time
available at the end of this trial was largely the consequence of
GSX's mismanagement of its case-in-chief, for which neither MCI
nor the court was responsible," and where the "allocation of
additional time to GSX would have been unfair to MCI").

### (3) Dr. Frishberg's Damages Testimony

MJ argues that Dr. Frishberg's testimony should have been
precluded because it (1) was contrary to the law, (2) was based
on erroneous assumptions as to certain key facts, and (3) changed
the methodology disclosed in his expert reports.

Dr. Frishberg testified that MJ's infringement in this case
began in April 1991, but that the hypothetical royalty rate
agreement (used to calculate damages) would not have been reached
by the parties until 1994, when Applera's Supplier Authorization
Program was implemented.  MJ argues that this testimony was
contrary to law under the standard set forth in Georgia-Pacific
v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y.
1970), which provides that the hypothetical agreement must have
been reached "at the time the infringement began." Id. at 1120.
The standard for determining a reasonable royalty is not so
limited, however, and must be viewed with "flexibility." Fromson

v. Western Litho Plate and Supply Co., 853 F.2d 1568 (Fed. Cir.
1988) (methodology "speaks of negotiations as of the time
infringement began, yet permits and often requires a court to
look to events and facts that occurred thereafter and that could
not have been known to or predicted by the hypothesized
negotiators"), overruled on other grounds by Knorr-Bremse Systeme
Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337 (Fed. Cir.
2004).  Because Applera began licensing thermal cycler suppliers
through its SAP in 1994, and because plaintiffs sought damages
only from 1994, it was reasonable for Dr. Frishberg to calculate
the royalty rate from that date.

MJ also argues that Dr. Frishberg's testimony that
plaintiffs' damages totaled $61 million was contrary to law
because MJ's net reported income for the years for which damages
were sought was only $43 million, and therefore the royalty rate
Dr. Frishberg proposed would have improperly left MJ without a
"reasonable profit."  See Georgia-Pacific, 318 F. Supp. at 1120
(reasonable royalty is hypothetical amount that infringer "would
have been willing to pay as a royalty and yet be able to make a
reasonable profit and which amount would have been acceptable by
a prudent patentee who was willing to grant a license.").  "The
determination of a reasonably royalty, however, is based not on
the infringer's profit, but on the royalty to which a willing
licensor and a willing licensee would have agreed at the time the

infringement began." Radio Steel & Mfg. Co. v. MTD Products, Inc.
788 F.2d 1554, 1557 (Fed. Cir. 1986); see also Rite-Hite Corp. v.
Kelley Co., 56 F.3d 1538, 1554-55 (Fed. Cir. 1995)(en banc)("The
fact that the award was not based on the infringer's profits did
not make it an unreasonable award. Furthermore, the fact that the
award was based on and was a significant portion of the
patentee's profits also does not make the award unreasonable.")
(citations omitted); Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572,
1580 n. 1 (Fed. Cir. 1996) ("[C]ourts have employed methodologies
in calculating reasonable royalties in which the royalties exceed
the infringer's profit.").  Because it is reasonable to assume
that at least some of the costs of a license may be passed on to
the customer, Dr. Frishberg's testimony was not contrary to the
law.  MJ, moreover, was permitted to argue that the damages
plaintiffs sought exceeded their net income, and in fact the jury
awarded damages totaling only $19.8 million.

MJ also argues that Dr. Frishberg made several erroneous
assumptions about how PCR process rights were licensed prior to
the implementation of the SAP in 1994.  As plaintiffs did not
seek damages for any infringement occurring prior to 1994, any
such errors were immaterial.  MJ was not precluded from
introducing evidence that the post-1994 royalty rates were
unreasonable.

Finally, MJ's argument that Dr. Frishberg's trial testimony

changed the methodology for assessing royalties on loaner and repair units that he used in the expert reports issued in 2000 is not a sufficient basis for a new trial, as MJ cross-examined Dr. Frishberg on the variances between his testimony and the initial expert report.

**(4) Testimony of Dr. Ford**

MJ argues that the testimony of Dr. Ford should have been precluded because plaintiffs failed to meet their notice obligations under Fed. R. Evid. 807, and because Dr. Ford's methodology was flawed, leading to untrustworthy conclusions.

The Court declines to modify its earlier decision on these matters, as set forth on the record of March 9, 2004:

> A review of Dr. Ford's surveys, see Cote Decl. [Doc. #778] Ex. 28; Cote Decl. [Doc. #786] Ex. 29, 30, reveals rigorous methodological standards applied by an experienced survey researcher using a double blind survey protocol, see e.g. Cote Decl. [Doc. #778] Ex. 28 ¶ 9 ("not only were the respondents not informed as to the purpose or sponsor of the survey, but similarly both the survey's supervisors and interviewers were not informed as to the purpose or sponsor of the survey"); see also Cote Decl. [Doc. #886] Ex. 29 ¶ 14-15; Ex. 30 ¶ 10, and clear, precise, and predominately non-leading questions, see e.g. Cote Decl. [Doc. #778] Ex. 28 (Survey Screener Questionnaire).[1]  In addition, the

_____

[1]For example, among the questions asked of survey respondents were the following:
> "Currently, are one or more thermal cyclers used in your lab?; May I please speak to the person in your lab who is the most knowledgeable about how the thermal cyclers in your lab are used?; How many thermal cyclers do you have in your lab?; Is the thermal cycler in your lab a MJ Research, Perkin-Elmer, Hybaid, Techne, Ericomp, or Strategene?; During that period, has your [insert brand] thermal cycler been used to perform any of the following techniques: PCR?

questions pertained in part to experiences learned by direct
perception and to events that are unlikely to be forgotten,
namely the usage of thermal cyclers in respondent's lab
during a period not exceeding six years, and were posed to
individuals who by self-report were the most knowledgeable
in the lab about such usage.

.  .  .  .

With respect to the notice prong of Rule 807,
defendants had all three surveys since September 2002.
Defendants provided in discovery their invoice database from
which Ford selected respondents and thus MJ could have
conducted its own survey of MJ customers to test the
reliability of Ford's methodology and/or results.  In fact,
Dr. Ford and other researchers are prohibited by ethical
rules from disclosing the actual individual identities of
the survey respondents and instructed to defend against
Court orders compelling disclosure, <u>see</u> Cote Decl. [Doc.
#786] Ex. 35 (Code of Standards and Ethics 1997) at 7.  The
Reference Manual for Scientific Evidence published by the
Federal Judicial Center instructs that, because of such
ethical obligations, identifying information such as names
and addresses should be removed from survey data before it
is provided to opposing counsel, <u>see</u> Ex. 33 at 271-72.

.  .  .

Under the circumstances of record here, the Court
believes the name and address requirement of Rule 807 has
been satisfied.  To hold otherwise would require exclusion
of trustworthy evidence on material facts in this case and
violate the mandate of Fed. R. Evid. 102 to construe Rule
807 and the other rules of evidence "to secure fairness ...
in promotion of growth and development of the law of
evidence to the end that the truth may be ascertained and
proceedings justly determined."

Trial Transcript Vol. IV, March 9, 2001 [Doc. # 1106] at 682-83,

687-88 (citations modified and footnote added).

_____

Long PCR? Hotstart PCR? RT-PCR? Quantitative PCR? In situ
PCR? RAPDs (Rapids) or AFLP? Differential display PCR? PCR
done in preparation for cycle sequencing? PCR done
simultaneously with or coupled with cycle sequencing?" etc.

Because the Ford survey satisfied the requirements of Rule 807, MJ's concerns more appropriately went to the weight the jury should afford the survey results.  MJ extensively cross examined Dr. Ford on the subject of survey respondents' knowledge about the applications being performed on the thermal cyclers, and the jury therefore had before it the information needed to weigh the impact of the survey.

### (5) Mullis Stipulation

The Court also declines to reconsider its decision that the stipulation by plaintiffs' counsel during the cross-examination of Dr. Mullis that "the claims in which Dr. Mullis is inventor have PCR in them," and "every claim we've looked at has PCR where he's an inventor," Trial Tr. at 273, did not stipulate that the claims required performance of PCR.  As the Court reasoned during trial:

> The reexamined claims '675 resulted in a construction for 17 and 33 that they were programmed to perform PCR, but not that they were required to perform PCR.  Mr. Powers' objection in the context of the question asked to Dr. Mullis therefore had merit, and the stipulation was that every claim on which Mullis claimed he was the sole inventor had PCR in it.  That, however, is simply not the stipulation that the claims required performance of PCR.  That was defendants' position at the construction stage.  The Court rejected it in the Markman ruling.  Therefore, it seems to the Court patently unreasonable to construe Mr. Powers as agreeing to terms contrary to the Court's ruling, even if there is ambiguity with respect to what was stipulated.

Trial Tr. Vol.  X [Doc. # 1108] at 2033-34.

Accordingly, the Court did not "refuse to enforce the oral

11

stipulation," as MJ now argues, Defs.' Mem. at 16; it merely
construed the stipulation in accordance with its limited language
and the Court's preexisting claim construction, and declined to
add language that had not been expressed or implied.

**(6) Hp-50 Spectrophotometer**

The Court precluded defendants from relying on the HP-50
spectrophotometer as invalidating prior art based on defendants'
failure to give notice under 35 U.S.C. § 282, which requires
"notice in the pleadings or otherwise in writing to the adverse
party at least thirty days before the trial. . . ."  While the
Federal Circuit in Eaton Corp. v. Appliance Valves Corp., 790
F.2d 874 (Fed. Cir. 1986) permitted introduction of prior art
despite the failure to give notice under Section 282 where the
plaintiff otherwise was otherwise aware of the prior art, noting
that "Federal Rule 26 indicates Congress's clear intent that
courts be permissive in the introduction of relevant evidence,"
it did not require introduction of such prior art, and the
Federal Rules of Procedure have since been made more restrictive.
See Fed. R. Civ. P. 37(c)(1) ("A party that without substantial
justification fails to disclose information required by Rule
26(a) or 26(e)(1) . . . is not, unless such failure is harmless,
permitted to use as evidence at trial . . . any . . . information
not so disclosed.") (amended in 1993).  The Federal Circuit in
Ferguson Beauregard/Logic Controls, Div. of Dover v. Mega
Systems, LLC, 350 F.3d 1327 (Fed. Cir. 2003), moreover, has

12

approved a similar preclusion of prior art, describing such preclusion as simply "follow[ing] the letter of § 282 precisely." Id. at 1347.  Here, MJ failed to provide any justification for its failure to disclose the HP spectrophotometer as prior art, nor has it established that the late disclosure was harmless.

Moreover, as discussed in this Court's inequitable conduct decision, see [Doc. # 1297], the testimony MJ elicited at trial from Dr. Mullis did not establish that the HP-50 spectrophotometer was material to patentability.  Accordingly, MJ has not shown that it was prejudiced by its inability to argue that the device was invalidating prior art.

### (7) Construction of the Term "Metal Block"

MJ argues that the Court failed to provide the jury with its complete construction of the term "metal block," as set forth in its partial summary judgment decision.  The summary judgment decision, however, merely applied the Court's earlier claim construction; it did not modify it.  The jury was instructed on the relevant construction of "metal block,' as for example, in the instruction on Claim 17 of the '675 patent:

> The metal heat-conducting block must have a reaction well, which may be either a recess machined into the metal block or a plastic container that sits in a recess formed in the block.  The recess need not be in the top surface of the metal block.  The ordinary meaning of a recess machined into a block is a solid body of metal with a receding or hollow place in its surface.

Jury Instructions [Doc. # 1077] at 36.

13

As subsequently clarified, the partial summary judgment decision ruled only on the sample holder that was before the Court in the summary judgment record, and thus, as to "[t]hose sample holders not . . . before the Court, their likeness [to the sample holder found to not infringe] remained an issue for trial." Clarification [Doc. # 974] at 9-10.  The jury, therefore, was tasked with the purely factual question of whether MJ's sample holders infringed the metal block requirement literally or under the doctrine of equivalents, and was not left to construe any part of the patent claims.[2]

**(8) Claim Construction**

MJ bases its request for a new trial on errors in the Court's claim construction.  MJ previously moved for reconsideration [Doc. # 719] of only the "link data field" portion of the Court's claim construction.  This motion having been denied, see [Doc. # 834], and the time having passed for any further motions for reconsideration, there is no basis for ordering a new trial on this ground.

**(9) Dr. Margulies' Testimony**

MJ argues that Dr. Margulies should have been precluded from offering testimony that MJ's sample holders infringed the metal

---

[2]MJ challenge to the jury's finding of infringement of the metal block element, raised in its Rule 50 motion for judgment as a matter of law, is addressed in the Court's decision on that separately filed motion.

14

block element of the asserted claims of the '675 and '493 patents under the doctrine of equivalents, because his expert reports contained only generic opinions on equivalency with regard to the '675 patent and no opinion with regard to the '493 patent. During Dr. Margulies' testimony on March 12, 2004, MJ objected on grounds that "there is an equivalency issue here concerning the metal block of claim 16 of the '493," which was "new testimony," Trial Tr. Vol. VII [Doc. # 1103] at 1267, and was invited to be heard on its objection at the next recess.  MJ did not pursue this objection, however, until the day evidence closed on March 25, 2005, when it filed a motion to strike and preclude this testimony.

Regardless of its untimeliness, MJ's motion to preclude testimony lacks merit because Dr. Margulies in fact submitted a supplemental expert report on December 13, 2003 that discussed the '493 patent claims, and because Dr. Margulies's analysis of the metal block element of the '610 patent applies with equal force to the metal block elements of the '675 and '493 patent claims.  See Trial Tr. Vol. VII at 1266; id. at 1272 ("It's the same analysis as far as the '610 patent is concerned, the same metal blocks and the same equivalence.").

**(10) Dr. Mullis' Nobel Prize**

MJ argues that it was unduly prejudiced by the Court's decision to allow the jury to handle and examine the Nobel Prize

Dr. Mullis was awarded for his invention of the PCR process, because the Nobel Prize was irrelevant to the question of whether MJ induced infringement.  The importance of the invention was, however, relevant to the plaintiffs' claim of damages.  The Court therefore declines to reconsider its decision to admit the Nobel Prize.  See Trial Tr. Vol. I [Doc. # 1100] at 94 ("We asked the jury at the jury selection whether they would be able to put aside being impressed about the Nobel prize.  They all said they could.  We're asking these people to listen to evidence that is from a foreign universe for them.  It seems to me there is no harm at the beginning by way of background to let them see a Nobel Prize.").

### (11) Testimony of Michael Finney

MJ argues that the Court's preclusion of testimony by Michael Finney was in error because lay witnesses with first hand knowledge are permitted to testify as to technical matters.  The Court disagrees.  In a ruling issued on February 3, 2004 [Doc. # 880], this Court precluded expert testimony by Michael Finney because defendants failed to timely disclose him as an expert witness.  In that ruling, the Court noted that "the amendments to Fed. R. Evid. 701 in 2000 were designed to prevent exactly what MJ now attempts to do - call expert witnesses in the guise of laypersons to offer opinion testimony on invalidity and infringement."  Id. at 13-14; see also Fed. R. Evid. 701 Advisory

16

Committee Notes (2000)("By channeling testimony that is actually
expert testimony to Rule 702, the amendment also ensures that a
party will not evade the expert witness disclosure requirements
set forth in Fed. R. Civ. P. 26 ... by simply calling an expert
witness in the guise of a layperson. ...  The amendment makes
clear that any part of a witness' testimony that is based upon
scientific, technical, or other specialized knowledge within the
scope of Rule 702 is governed by the standards of 702 and the
corresponding disclosure requirements of the Civil and Criminal
Rules.").  As the cases on which MJ relies, <u>see</u>, <u>e.g.</u>, <u>Aspludh
Manuf. Div. v. Benton Harbor Eng'g.</u>, 57 F.3d 1190, 1201 (3d Cir.
1995), were issued prior to the 2000 amendment, they do not
suggest that the current version of Rule 701 should be
interpreted as expansively as MJ requests.

### (12) Jury Instructions

MJ's objections to the jury instructions fail to establish
the denial of a fair trial.  In particular:

- MJ's objection to the "equal time" instruction (at p.
  15) lacks merit because both parties were allotted 20
  hours for the presentation of evidence.

- MJ's objection to the "parties and their contentions"
  instruction (at p. 18) is unavailing because
  inequitable conduct is an issue for the Court, not the
  jury, <u>see</u> <u>Duro-Last, Inc. v. Custom Seal, Inc.</u>, 321
  F.3d 1098, 1110 (Fed. Cir. 2003), and there is no
  requirement that advisory interrogatories be submitted
  to the jury.  The "active assistance" instruction,
  moreover, was consistent with the Federal Circuit's
  language in <u>Manville Sales Corp. v. Paramount Sys.,
  Inc.</u>, 917 F.2d 544, 553 (Fed. Cir. 1990), that

"corporate officers who actively assist with their corporation's infringement may be personally liable for inducing infringement."

- MJ's objection to the "Patent Infringement–Generally" instruction (at p. 22) lacks merit because the jury was properly instructed on contributory infringement on page 27.

- MJ's objection to the "Direct Infringement" instruction (at p. 23) lacks merit because an instruction that MJ did not directly infringe claims 17 and 33 of the '675 patent and claim 16 of the '493 patent would have been superfluous, as the jury was instructed that direct infringement related only to claim 45 of the '675 patent and claims 1, 44, 158, and 160 of the '610 patent, and the verdict form properly guided the jury on the relevant infringement issues for each claim.

  As to MJ's argument that there was insufficient evidence to support an instruction on selling components of the invention, MJ failed to raise this issue before the jury was charged, and the use of this instruction cannot be said to have "undermine[d] the integrity of the trial." Innomed Labs, LLC v. ALZA Corp., 368 F.3d 148, 155 (2d Cir. 2004).

- MJ's objection to the "Inducing Patent Infringement" instruction (at p. 24) lacks merit. First, as set forth on the record of the March 24, 2004 charge conference, defendants' request for an instruction that defendants "caused direct infringement of the patent" as a fourth element necessary for proving inducement was "confusing and duplicative" because "[t]he causation prong is included in factor number one, that defendants took actions that caused, urged, encouraged or aided MJ's customers to use a product in a manner that infringes . . ." Tr. of Charge Conference [Doc. # 1144] at 7. Second, the jury was clearly instructed that "there can be no inducement of infringement unless MJ's customers directly infringed a claim of the thermal cycler or PCR process patents." Jury Instructions at 24. Third, the fact that the Court did not use MJ's proposed inducement instruction on the intent element is not itself error, and MJ has not identified any error in the Court's intent instruction. See id. (instructing jury that "Applera must prove that MJ possessed specific intent to encourage its

18

customers' infringement, not merely that it had
knowledge of the customers' acts which Applera claims
constitute infringement.").  Finally, the Court's
inclusion of the instruction that "A patent owner is
not required either to sell licenses for use of its
patents or to permit others to act as its agents for
licensing end users," was appropriate in the context of
this case, where MJ had made Applera's refusal to allow
MJ to sell end user licenses an issue.

- MJ's objection to the instruction on "Inducement:
  Foreign Sales and Uses" (at p. 26) lacks merit because
  the instruction specifically instructs the jury <u>not</u> to
  consider whether MJ induced infringement of the process
  patents outside of the United States.  The instruction
  makes clear that "Applera does not accuse MJ of
  inducing infringement of the PCR Process Patents
  outside of the United States.  You are not to consider
  evidence of sales to foreign purchasers who use the PCR
  process exclusively outside of the United States when
  you consider whether Defendants induced infringement
  within the United States. Applera does assert that MJ
  induced infringement of the Thermal Cycler Patents
  outside of the United States."  There was sufficient
  evidence for the jury to consider "whether Applera has
  proved that MJ induced someone outside of the United
  States to combine in a manner that would infringe the
  Thermal Cycler Patents the components that MJ supplied
  in or from the United States."

- MJ's objection to the Contributory Infringement
  instruction (at p. 27) lacks merit because the Court
  supplemented its charge on April 1, 2004, elaborating
  on the meaning of "substantial noninfringing use."  <u>See</u>
  Trial Tr. Vol. XIV [Doc. # 1111] at 2873.

- MJ's objection to the "Literal Infringement"
  instruction (at p. 28) lacks merit because the
  instruction is legally correct.  <u>See</u> <u>Northern Telecom,</u>
  <u>Inc. v. Datapoint Corp.</u>, 908 F.2d 931, 945 (Fed. Cir.
  1990)("The addition of features does not avoid
  infringement, if all the elements of the patent claims
  have been adopted. ... Nor is infringement avoided if a
  claimed feature performs not only as shown in the
  patent, but also performs an additional function.").
  This instruction simply says if there are more features
  in the accused device than elements in a patent,
  infringement still obtains where all of the elements

are present in the accused device notwithstanding the presence of other elements as well.

- MJ's objection to the "Doctrine of Equivalents" instruction (at p. 30) lacks merit because the jury was instructed that each component part must be either the same as or substantially equivalent to that specified in the patent claim, and that the jury "must look at each individual limitation of the patent claim and decide whether the accused product or its use has an identical or equivalent part or step."

- MJ has not demonstrated any prejudice from the reference to the PCR process patents in the "Open Ended Claims" instruction (at p. 32).

- MJ's objections to the "Construction of Claims" instruction (at p. 33) and "Construction of Claim 1 of the '610 Patent" (at p. 40-41) lack merit because the jury was informed that it was being instructed only on disputed claim terms.

- MJ's objection to the "Infringement/Defendants' Improvements" instruction (at p. 44) lacks merit because it is legally correct, and the jury was properly instructed on the claims to which the doctrine of equivalents applied.

- MJ's objection to the "Personal Liability for Infringement by Corporation" (at p. 47) lacks merit, for the reasons set forth in this Court's January 27, 2004 decision [Doc. # 873].

- MJ's objection to the "Joint Inventorship" instruction (at p. 55) does not support the granting of a new trial.  While 35 U.S.C. § 116 "does not set forth the minimum quality or quantity of contribution required for joint inventorship," Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227 (Fed Cir. 1994), MJ has not demonstrated that the inclusion of the "important or necessary" language was unduly prejudicial, particularly in light of the further explication in the charge that "One does not qualify as a joint inventor merely by providing the inventor with well-known principles or information.  One also does not qualify as a joint inventor by using routine skill to assist the inventor, either directly or indirectly, to perfect the inventor's idea, to confirm its operability, to

construct it, or to otherwise merely reduce it to practice."

- MJ's objection to the "Reasonable Royalty as a Measure of Damages" instruction (at p. 68) is without merit, because inducement damages are not required to be addressed separately.  See Foster v. Am. Machinery & Foundry Co., 492 F.2d 1317, 1321 (Fed. Cir. 1974) (upholding award of damages based on hypothetical negotiation between patent holder and inducer).

- MJ's objection to the "Factors for Determining Reasonable Royalty" instruction (at p. 70) lacks merit, because consideration of what other licensees paid is consistent with the purpose of the "hypothetical negotiation" standard — to look at a variety of evidence to determine what two hypothetical parties would do.  That Georgia-Pacific, 318 F.Supp. at 1120, was limited to the negotiation between the infringer and the patent holder does not require that other licensees cannot be taken into account.

- MJ's objection to "Damages-Summary" instruction (at p. 73) lacks merit as an instruction that the jury should not consider interest, attorneys' fees or expenses is not required, and no evidence on attorneys' fees or expenses was introduced at trial.

- MJ's objections to the Court's failure to instruct on various topics also lack merit, as the requested instructions were either superfluous in light of the existing instructions, or would inappropriately marshal evidence.  The cases MJ cites in support of its request for an instruction on Applera's "duty to minimize damages" fail to support the use of this instruction in a patent case.

**(13) Interpretation of Verdict Form**

The Court has addressed MJ's arguments on the proper interpretation of the verdict form in its April 28, 2004 decision [Doc. # 1101] and declines to reconsider this decision.

## II.   Conclusion

For the foregoing reasons, defendants' motion for a new trial [Doc. # 1314] is DENIED.

IT IS SO ORDERED.

/s/

_____

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 25th day of August, 2005.**

22